IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, §

    Plaintiff,          §   CASE NO. 21–cr–20067–MGC–2

vs.                    §

JOHNNY PHILUS,        §

    Defendant.      §
_____/

## SENTENCING MEMORANDUM AND INCORPORATED MOTION FOR DOWNWARD VARIANCE BELOW THE LOW END OF THE APPLICABLE GUIDELINE RANGE

**COMES NOW** the Defendant, JOHNNY PHILUS, by and through his undersigned counsel,  and respectfully submits this sentencing memorandum in support of his request for a sentence below the applicable guideline range that is "sufficient, but not greater than necessary, to comply with the purposes set forth" in 18 U.S.C. §3553(a).  Undersigned counsel recommends that this court sentence the Defendant to twelve (12) months and one day of incarceration followed by twelve (12) months of house arrest, followed by three years of supervised release.

## I.  INTRODUCTION

Johnny Philus is a 34 year–old stepfather of three children: Ken–Neil Rolle, age 21; Jayvyn Exulien, age 14 and Jordyn Exulien, age 13. Mr. Philus and Latoya Stanley have been in a loving and committed relationship for the past ten years. Ms. Stanley is self–employed making and repairing wigs. Ms. Stanley is Mr. Philus's co–defendant in the case at Bar.

*United States of America v. Johnny Philus*
Case No. 21–cr–20067–MGC–2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 2 of 21

Johnny Philus was born in White Plains, New York and resided there until he was four years old when his family moved to Miami, Florida. He attended North Miami High School and received his high school diploma from Bay Point School where Johnny was sentenced as part of a Juvenile case. While at high school, he was a member of the band, and he was on the varsity football team. He went to church weekly with his family.

Mr. Philus was fortunate to grow up in a loving family, but his family could not protect him from the dangers and crime he was exposed to in his North Miami neighborhood.

### a.  Mr. Philus's Upbringing in North Miami

The current crime statistics for North Miami are frightening, and they were even worse when Johnny was growing up there.

With a crime rate of forty–seven (47) per one thousand (1000) residents, North Miami has one of the highest crime rates in America compared to all communities of all sizes – from the smallest towns to the very largest cities.[1] Within Florida, more than 93% of the communities have a lower crime rate than North Miami. The chances of becoming a victim of either violent or property crime there is one in twenty–one. Violent offenses tracked included rape, murder and non-negligent manslaughter, armed robbery, and aggravated assault, including assault with a deadly weapon.

---

[1]Neighborhood Scout, https://www.neighborhoodscout.com/fl/north–miami/crime#:~:text= With%20a%20crime%20rate%20of,here%20is%20one%20in%2021, May 23, 2021

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 3 of 21

When he was a young child, Mr. Philus saw violence, illegal gang activity, people getting arrested and chased by the police, and the sale of narcotics daily. He also witnessed people being threatened with beatings, stabbings, and shootings, and being physically assaulted. He was the victim of numerous beatings and a shooting when another youth tried to rob him. During the robbery, Johnny was shot in the back three times while he, as the victim, was running away.  A number of his peers were the aggressors or victims of community violence—including drug use, beatings, shootings, stabbings, and break-ins, within his neighborhood and school.

Researchers have known from decades of research and study that exposure to this type of community violence can lead to emotional, social, and cognitive problems. Children exposed to a violent environment are often more aggressive and more involved in antisocial behavior than children who are not.[2]  Many psychiatrists and other experts believe that crime, particularly among adolescents, can be "contagious," meaning that living in more violent neighborhoods and communities can cause a vicious cycle of high crime rates. A research team at Temple University found that youth are much more likely to commit crimes if they live in high-crime neighborhoods and have greater chances of reoffending if there is a high recidivism rate in their communities.[3]

Johnny was constantly surrounded by friends, school mates and neighbors who engaged in violence and criminal activity on a day-to-day basis and many argue that "the evidence is clear: aggression and violence among friends can be

---

[2] Springer Link, Dario Bacchini, Growing Up in Violent Contexts: Differential Effects of Community, Family, and School Violence on Child Adjustment, 20 October 2019.
[3] The Coaction Of Neighborhood and Individual Effects on Juvenile recidivism, Temple University,  published in Cityscape: A Journal of Policy Development and Research, Volume 13, Number 3, 2011, U.S. Department of Housing and Urban Development, Officer of Policy Development and Research.

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 4 of 21

contagious."[4] Johnny tried to avoid these negative influences; he attended after-school activities, played sports, and participated in the school band to keep him away from the streets. He even took a job selling candy in other neighborhoods to make some pocket money. Unfortunately, the desire to be accepted by his friends, the lack of parental supervision, and the pressure of struggling financially led him to commit crimes that he now regrets. Of course, his upbringing is no excuse for his commission of the crime that brings him before Your Honor.

### b. Mr. Philus's Home Life

Johnny's home life was also challenging, and he was often left to fend for himself. His father worked two jobs, one as a cook the other as a landscaper. His mother worked full-time as a housekeeper at a hotel. Johnny usually made his own meals with his siblings and was entrusted to do his homework alone without any help or guidance.

Johnny lived in a small home with six other family members. They had enough money to put food on the table, but there was never anything left over. His parents constantly worried over bills and did the best they could to support their children. Living in a violent neighborhood and a disadvantaged home left Johnny feeling stressed and depressed from a young age. He turned to marijuana to help him cope and continued to use marijuana daily for the next fifteen years.

### c. Mr. Philus's High School Experience

For many children growing up in a dangerous and violent neighborhood, their school becomes a refuge. However, for Johnny, his experience at North Miami

---

[4] MST Services, *How Communities Impact Juvenile Crime*, August 18, 2018

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 5 of 21

High School was just an extension of his life on the street. Many of his classmates came to school with weapons and drugs. Fights would break out regularly and security officers would step in to control them.  Several female students were pregnant at the school including at least one student who was impregnated by a security officer at the school.

North Miami Senior High School placed in the bottom 50% of all schools in Florida for overall test scores for the 2017-2018 school year.[5] (Undersigned counsel was unable to find the records for the time Mr. Philus attended the school), the student-teacher ratio of 20:1 is considerably higher than the Florida state level of 16:1. Minority enrollment is 98% of the student body (majority Black), which is higher than the Florida state average of 62%. Approximately 82% of students are "economically disadvantaged".

Statistics like those support our contention that Mr. Philus had the deck stacked against him when entering this world. Growing up in a dangerous neighborhood, attending an underperforming school, living in a low-income home with little to no supervision provided Mr. Philus with major challenges to overcome. Undersigned counsel acknowledges that many other people in this country live in those circumstances and do not go on to commit crimes. Mr. Philus's background gives some insight into his criminal conduct and is not an excuse.

## II. <u>FACTS SURROUNDING THE INSTANT OFFENSE</u>

On March 8, 2021, Mr. Philus entered a plea of guilty to a one-count Information which charged him with conspiracy to defraud the United States, that is, conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371.

---

[5]Public School Review, North Miami Senior Higher, 2017-2018 school year
https://www.publicschoolreview.com/north-miami-senior-high-school-profile

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 6 of 21

This case arises out of the defendant's involvement in conspiring with others to apply for a loan from the Paycheck Protection Program ("PPP") and Economic Injury Disaster Loan ("EIDL").

Mr. Philus and his cousin, Johnas ("Jay") Andre, grew up together and are very close. Mr. Andre is a college graduate who worked for Deloitte as a Senior Designer II.  Johnny has always looked up to his cousin and trusted his advice.

When the COVID-19 pandemic struck, Mr. Philus's business came to a halt. Since 2011, he has been the owner and operator of Elegance Auto Boutique, LLC ("Elegance Auto"), a car rental business. No one rented cars from him after the COVID-19 pandemic hit.

Given that Mr. Philus only has a high school diploma, he is not a savvy or experienced business owner. He did the best that he could to promote his business and appeal to customers. His customers rent vehicles from him for a few days or a few months. During the pandemic, he had no clients. He complained to Jay that he was struggling. Jay told him that he (Jay) had just filed for a PPP loan and had been approved. He offered to help Johnny apply for a PPP loan. Johnny had heard about the PPP loan program and understood that if he had a business, he might qualify for a loan which he did not have to pay back as long as he used the money to pay payroll and business expenses. Jay told him he would help him with the application and asked Johnny for his personal and business information, which Johnny provided. Johnny did not fill out the PPP application, did not sign it, and did not create or even see any of the documents that were submitted with the application – Nevertheless, his involvement in the crime was knowing and intentional in order for him to receive money which was to be used to purchase vehicles to expand his business.

*United States of America v. Johnny Philus*
Case No. 21–cr–20067–MGC–2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 7 of 21

When the lender called Johnny to confirm the loan details, Johnny had to call Jay and ask how much money had been requested and how many employees had been listed. Johnny then provided false information to the lender regarding the number of employees, the number of vehicles he owned and rented, and those vehicles' value. Johnny expected to receive a loan of $100,000 and was shocked when the amount in his bank account was $538,325. Jay told Johnny that to have the loan forgiven, he needed to set up payroll for his employees, and he provided Johnny with the name and phone number of a company that could set up the payroll for him. Both Johnny and Jay knew that Johnny did not have employees and that Johnny would list his friends and family members as employees so they would receive the payroll disbursements. Johnny contacted the payroll company and provided them with the personal information of friends and family that he claimed were his employees.

Shortly after receiving the money, Johnny was told that his bank account was being closed, and the money was being sent back to the lender. Johnny called Jay and advised him of the situation, to which Jay responded that he did not know what had happened and he would help Johnny get "the money back." Unbeknownst to Mr. Philus, a second application for an EIDL was filed, and the lender attempted to disburse $150,000 into Mr. Philus's bank account. These funds were immediately returned to the lender by the bank.

Mr. Philus had no knowledge that a second application was filed on his behalf and did not consent for that application to be filed. Since that time, *$535,653.54 has been returned* to the lender, which means *Johnny only received $2,671.46 in illegal proceeds* due to his participation in this fraudulent conspiracy, although some of Johnny's relatives did receive money that they were not entitled to as a result of this crime.

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 8 of 21

### III.   THE COURT SHOULD DEPART DOWNWARD BASED ON OVERSTATEMENT OF CRIMINAL HISTORY

The policy statement for the Federal Sentencing Guideline §4A1.3(b)(1) provides that a downward departure may be warranted "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."

It is important to consider Johnny Philus's criminal history in the context of the crime-ridden and violent neighborhood he grew up in. Mr. Philus fell prey to becoming friends with a group of young men that negatively influenced him. Johnny was arrested in connection with numerous armed robbery charges and committed to the Department of Juvenile Justice and placed in a maximum risk program combined with an after-care program focusing on drug treatment. Johnny was eventually transferred from Omega Juvenile Prison Boot Camp to Bay Point School ("Bay Point"). The crimes he committed as a juvenile were serious, but he learned valuable lessons during his time at Bay Point. Unfortunately for Mr. Philus, his time at Bay Point did not cure him of his marijuana habit. By that time, he had been smoking marijuana since he was a young teenager daily. In several traffic stops for alleged minor infractions such as window tints, he was arrested three times for marijuana possession.

Johnny Philus also acknowledges that he was very irresponsible with his vehicle and allowed many of his friends and family to drive it. On numerous occasions, they received speeding tickets, toll violations, or other tickets while driving the vehicle. Non-payment of those infractions resulted in Johnny's driver's license being suspended. Even when Mr. Philus received tickets himself,

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 9 of 21

he often did not pay the tickets, the fines, and the court costs, and his license was suspended for non-payment.

The Guidelines in this case greatly exaggerate the significance of Mr. Philus's criminal history. For these reasons, Mr. Philus respectfully requests the court to grant his motion for downward variance.

### III.   THE FACTORS 18 IN U.S.C. §3553 SUPPORT THE DEFENDANT'S MOTION FOR A DOWNWARD DEPARTURE AND DOWNWARD VARIANCE

#### A. THE COURT MUST CONSIDER ALL FACTORS SURROUNDING THE OFFENSE WHEN DETERMINING SENTENCE

The greatest benefit of the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005) was that it once again vested the power with federal district judges to use discretion at sentencings. Post-*Booker,* judges are now again trusted to weigh the facts and surrounding circumstances of each individual case and defendant, and then tailor a sentence that they believe to be truly just. The beauty of the *Booker* decision is that although the Guidelines must be calculated and considered, they are but one factor the court must take into consideration when imposing sentence. The court should not simply look to the Guidelines and not take into consideration the many factors that inevitably surround an offense and a defendant's life.

Johnny Philus certainly deserves and expects punishment. But he is not a dangerous man who needs lengthy imprisonment to protect the public. His priors involve foolish decisions he made as a juvenile (over eighteen years ago), arrests caused by his use of marijuana, or irresponsible behavior concerning his driving

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 10 of 21

privileges. There is also no need to imprison him for a long time to reflect the acknowledged seriousness of this offense, Johnny is deeply embarrassed and remorseful for his actions, and he has admitted his responsibility. The nature and circumstances of the offense, the sentences of other defendants, and the history and characteristics unique to Mr. Philus support a significant variance below the applicable Guideline range.

B. <u>Nature and Circumstances of Instant Offense Support a Request for a Downward Variance</u>

The facts of this case do not fit within the heartland of conspiracy to commit wire fraud cases, and therefore, undersigned counsel respectfully suggests that this court should vary below the Guidelines in sentencing Johnny Philus as requested in the sentencing memorandum.

i.   <u>Mr. Philus's Limited Involvement in the Conspiracy Warrants a Downward Variance Below the Applicable Guideline Range</u>

Johnny Philus's involvement in the conspiracy was limited to providing his information to co-conspirators who then created fraudulent documents and submitted two PPP applications on Mr. Philus's behalf. He set up payroll for his friends and family, so the loan proceeds would be paid out to them. His involvement was deliberate and lasted for about two months.

Mr. Philus was in contact with his cousin Jay about the scheme. Johnny did not communicate with the other participants and was not aware of the much larger fraud that was operating. Johnny did not sign, review, or create the documents for the PPP application that was submitted under this company name.

*United States of America v. Johnny Philus*
Case No. 21–cr–20067–MGC–2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 11 of 21

It is also important to note that as part of the plea agreement, Johnny Philus took responsibility for the additional $150,000 associated with the EIDL application that was submitted under his company's name. However, Mr. Philus did not authorize his conspirators to submit that application. He did not sign it nor create the supporting documents. He was not even aware of its existence until he was arrested.  When the original PPP loan funds were frozen at the bank, Jay (Mr. Philus's cousin) told him he would help him "get the money back." Mr. Philus accepted the loss amount for the EIDL application because he believed that Jay would try to get the original funds from the PPP loan back or re-submit another application on his behalf and "the law" supports such a loss amount. Johnny had no idea what an EIDL application was and would not have agreed for Jay to submit one on his behalf, which claimed he was a "farmer" and lived on a farm.

Mr. Philus's loss amount is $688,325, which results in an increased offense level of 14 levels. However, if the $150,000 for the EIDL application was not included, the resulting loss amount would be $538,325 which would result in an increased offense level of 12 levels. Undersigned counsel acknowledges the signed plea agreement which includes the EIDL application guideline, however, we respectfully suggest that this court can consider that a more appropriate offense level would be an increase of 12 levels, not 14 levels. If the court agrees, this reduction can be done with a downward variance.

      ii.    <u>Mr. Philus's Lack of Financial Benefit and Overstatement of Guidelines Due to "Loss Amount" Warrant a Variance</u>

As is the case in most conspiracy to commit wire fraud cases, the Defendant's Guideline calculation is driven by the loss amount; this case is no different. Mr. Philus's Guideline punishment is driven by the "loss amount"

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 12 of 21

despite the fact almost all the monies were either sent back to the bank or were never received by him. Additionally, unlike the typical wire fraud cases where defendants use their ill gotten gains to purchase expensive items, the Defendant did not receive any financial benefit beyond the $2,600 his friends and family received through payroll.

From the original PPP loan of $538,325, a total of $535,653.54 was returned to Celtic Bank. From the $150,000 EIDL loan that was requested, there was a returned disbursement of $149,900. Mr. Philus never saw nor had access to the EIDL funds. The difference between the two numbers is due to wiring, transaction, and processing fees. Mr. Philus received very little financial benefit. What Johnny has lost is far more – his good reputation, now being a convicted Federal felon, his freedom, and financial loss.

Mr. Philus finds himself before this court, facing years in prison for being involved in the conspiracy for about two months, providing his information and names to someone else, and receiving a grand total of approximately $2,600. As such, these factors weigh very heavily in favor of a variance significantly below the applicable guideline range. We hope Your Honor will agree a sentence of a year and a day in custody, 12 months house arrest and three years' supervised release is a proper and just sentence.

C. THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT SUPPORT A SIGNIFICANT DOWNWARD VARIANCE

Johnny Philus has learned a great deal from his involvement and the felony conviction in this case. In reading the character letters submitted on behalf of

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 13 of 21

Johnny, it is clear that he is a person whose first and primary focus is his family.[6]
When he is not working to support his family, he dedicates every free moment to
his partner and his children.  Mr. Philus's devotion and deep commitment to his
family represent his character more than the instant offense.

        i.       <u>The Defendant Has Extraordinary Familial Obligations That Warrant
a Sentence Below the Applicable Guidelines</u>

    Mr. Philus is the primary breadwinner for his partner and three step
children who rely on him almost exclusively for support. The family faces severe
financial hardship. Of course, Mr. Philus should have considered his
responsibility to his partner and children before committing the crime he pled
guilty to. They will face tremendous emotional and financial hardship during the
period of Mr. Philus's incarceration. Mr. Philus admits and acknowledges his
involvement in this offense and is devastated that his actions will harm his family
and future. After his juvenile run-ins with the police, Johnny was a law-abiding
citizen until this time.

    The sad truth is that as a Black man, Mr. Philus and his family will face more
negative future consequences with respect to employment, financial security,
family stability, impact on his children's development and reintegration into
society than experienced by his white counterparts facing similar charges.

    The U.S. penal population of 2.2 million adults is the largest in the world.[7] In
2012, close to 25 percent of the world's prisoners were held in American prisons,

---

[6] These letters will be submitted as a separate filing.
[7] National Research Council, The National Academics Press, The Growth of Incarceration in the
United States: Exploring Causes and Consequences (2014), page 2, available at
https://doi.org/10.17226/18613.

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 14 of 21

although the United States accounts for only about 5 percent of the world's population.[8] More than half the prison population is Black or Hispanic.[9] In 2010, Black citizens were incarcerated at six times and Hispanics at three times the rate for non-Hispanic whites. [10] One scholar predicted that "imprisonment will become the most significant factor contributing to the dissolution and breakdown of African American families during the decade of the 1990s."[11]

Virtually all research on employment and earnings find that people who have been incarcerated and convicted do very poorly in the labor market because of their difficulty in being employed. Nowadays, someone's criminal history is available to all potential employers at the click of a button. More and more states and private employers are instituting rules to exclude individuals with criminal records permanently. In addition, extended periods of absence from the labor market can erode skills and create significant gaps in work histories, in turn raising questions about individuals' preparation for work.[12]   Research has also shown that men with prison records are estimated to earn thirty to forty percent less annually than men without prison records.[13]

The racial and ethnic disparities of the prison population are also reflected in the disparate rates of parental incarceration. In 2007, Black and Hispanic children in the United States were 7.5 and 2.7 times more likely, respectively, than white children to have a parent in prison.[14] Most studies find that incarceration is

---

[8] *Id.* At 2.
[9] *Id.* At 2.
[10] *Id.* at 2.
[11] King, A., *The impact of incarceration on African American families: Implications for practice.( Families in Society.* The Journal of Contemporary Human Services, 74, 145—153, (1993)
[12]  *Id.* At. National Research Council, page 235,  available at https://doi.org/10.17226/18613.
[13] Daniel Snyder, *One Size Does Not Fit All: A Look At The Disproportionate Effects Of Federal Mandatory Minimum Drug Sentences On Racial Minorities And How They Have Contributed To The Degradation Of The Underprivileged African-American Family,* 36 Hamline J. Pub. L. & Pol'y 77: Hamline Journal of Public Law and Policy Fall, 2014.
[14] *Id.* At. National Research Council, page 260,  available at https://doi.org/10.17226/18613

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 15 of 21

associated with weaker family bonds and lower levels of child well-being.  The
majority of children of incarcerated parents face profound and complex threats
to their emotional, physical, educational, and financial well-being.[15] Many
children whose parents are involved in the criminal justice system, in particular,
face a host of challenges and difficulties: psychological strain, antisocial
behavior, suspension or expulsion from school, economic hardship, and criminal
activity.[16] Children with imprisoned parents also do worse in school, and twenty-
three percent of children with incarcerated fathers are expelled or suspended,
compared to 4 percent of children without.[17] One statistic indicates that children
of incarcerated parents are, on average, six times more likely to become
incarcerated themselves.[18]

The closeness of the child and the incarcerated parents' relationship is often
a factor that can exacerbate the negative impact on the child of being separated
from that parent. Mr. Philus is very close to his three step sons, ages 13, 14, and
21. He is justifiably concerned that if he is separated from his children for an
extended period during this crucial period in their development, it could have
devastating consequences for them.

Incarceration of one parent also puts the remaining parent under immense
pressure to manage the financial, household and childcare duties which in turn

---

[15] Eric Martin, U.S. Department of Justice, Office of Justice Programs, National Institute of Justice
*Hidden Consequences: The Impact of Incarceration on Dependent Children* available at
https://www.nij.gov/journals/278/pages/impact-of-incarceration-on-dependent-
children.aspx
[16] *Id.*
[17] Clio Chang, The Century Foundation Incarcerated Fathers and the Children Left Behind,
September 93, 2004, https://tcf.org/content/commentary/incarcerated-fathers-and-the-
children-left-behind/?Agreed=1
[18] Megan Cox, *The Relationships Between Episodes of Parental Incarceration and Students'
Psycho-Social and Educational Outcomes: An Analysis of Risk Factors* , Philadelphia: Temple
University, 2009.

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 16 of 21

can result in a breakdown in the relationship between the parents. Numerous studies suggest that "those incarcerated had a much harder time marrying, staying married, and parenting their children."[19]

According to the Bureau of Justice Statistics, more than half of fathers in state prison report being the primary breadwinner in their family, thus the partners and children of these men experience a loss of economic resources while the provider is in prison.[20]  This effect is also likely to persist after the father returns home, given what is known about the link between incarceration and unemployment.

Although section 5H1.6 of the Guidelines state that "family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the Guidelines", courts have recognized that extraordinary family circumstances can warrant a downward departure. "The United States Sentencing Guidelines do not require a judge to leave compassion and common sense as the door to the courtroom." *United States v. Chambers,* 885 F.Supp. 12 (D.D.C. 1995). The studies suggest that Mr. Philus and his family are going to face considerable and disproportionate hardship because of his incarceration and because he is a Black man.

Mr. Philus is a devoted partner, father, brother, and son who was involved in a financial, non-violent offense. Undersigned counsel recommends a sentence

---

[19] Joseph E. Kennedy, *The Jena Six, Mass Incarceration, Remoralization of Civil Rights,* 44 Harv. C.R.-C.L. L. Rev. 477: Harvard Civil Rights-Civil Liberties Law Review, Summer 2009.
[20] Eric Martin, U.S. Department of Justice, Office of Justice Programs, National Institute of Justice *Hidden Consequences: The Impact of Incarceration on Dependent Children* available at https://www.nij.gov/journals/278/pages/impact-of-incarceration-on-dependent-children.aspx

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 17 of 21

below the applicable guideline range as requested herein as an appropriate sentence in this case.

D. <u>THE COURT SHOULD SEEK UNIFORMITY IN SENTENCING AND THAT SIMILARLY SITUATED DEFENDANT'S RECEIVE SIMILAR SENTENCES.</u>

18 U.S.C. §3553(a)(6) advises the court to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. In its holding in *Booker* the United States Supreme Court stated:

> "[t]his point is critically important. Congress' basic goal in passing the Sentencing Act was to move sentencing in the general direction of uniformity. That uniformity does not simply consist of similar sentences for those convicted of violation the same statute…[i]t consists, more importantly, of  similar relationships between sentences and real conduct…" *Supra* at 254.

The necessity for consistent and not disparate sentencing, especially within the same district, cannot be overstated. Part of the purpose behind creating the Sentencing Commission was to ensure that similarly situated defendants receive comparable sentences.

In *United States v. Jaafar*, 20-CR-00185-CMH, Eastern District of Virginia, Mr. Jaafar pled guilty to one count of conspiracy to defraud various financial institutions and the United States in violation of 18 U.S.C. § 371.(D.E. 34). He and his co-conspirator, his wife Monika Jaworska, submitted 18 fraudulent PPP loan applications in their own names and in names of their four business to twelve financial institutions. The eighteen PPP loans totaled $6,640,200 and a total of $1,438,500 was disbursed. The defendant withdrew $30,000 in cash, which the government later recovered. Additionally, between April 7, 2020, and April 15, 2020, Mr. Jaafar and his wife submitted two EIDL loan applications for two of the

*United States of America v. Johnny Philus*
Case No. 21–cr–20067–MGC–2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 18 of 21

shell entities to the SBA. As a result, one $10,000 EIDL advance was obtained from the SBA. Knowing he and his wife were both under investigation, and despite making plans to meet with the government in–person for a second planned meeting, Jaafar purchased one–way tickets for himself, his wife, and their two children, to fly from New York to Poland, June 20, 2020. Mr. Jaafar and his wife were arrested at John F. Kennedy International ("JFK") airport with 18 bags. Law enforcement found $49,875.65 in cash in the various bags, approximately 14 cell phones, and multiple laptops. Both Mr. Jaafar and his wife were taken into custody and ordered pre–trial detained. At sentencing, Mr. Jaafar's advisory guideline range was calculated to be 24 to 30 months' imprisonment. (D.E. 62). He was sentenced to 12 months' imprisonment. (D.E. 67). Ms. Jaworski's sentencing range was also calculated to be 24 to 30 months. At the time of sentencing, the parties jointly recommended a sentence of time served. Ms. Jaworska had been in custody for approximately six months.

Mr. Jaafar and Ms. Monika Jaworska's conduct was far more egregious than that of Mr. Philus. They knowingly submitted 18 fraudulent applications, secured loans over $1.8 million, and attempted to flee the country when they were arrested. However, like Mr. Philus they did not greatly financially benefit from their crimes as almost all the money was recovered. Mr. Jaafra and his wife were in a similar situation to Mr. Philus and Ms. Stanley concerning their children. Mr. Jaafar and his wife had two children and both parties recommended that since Ms. Jaworska seemed to be less culpable than her husband, she was the caretaker of the couple's two children, and to avoid the children being placed in foster–care or with other family members a sentence of time served was recommended for her.

In *United States v. Jackson,* 20–CR–112–MJN, Southern District of Ohio, Ms. Jackson pled guilty to two counts of scheme to defraud the United States in

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 19 of 21

violation of 18 U.S.C. §1343 and one count of false statement in violation of 18 U.S.C. §1001(a)(2). (D.E. 27). On March 29, 2020. Jackson submitted a loan application to the EIDL Program on behalf her company. A month later, she also applied for a PPP loan of $1,315,491.12. Soon after that she submitted another application seeking a PPP loan of $1,236,817. She submitted fraudulent tax documents and other supporting records for all these applications. A total of $2,312,117 in fraudulent loan proceeds was issued under the three loans; $6,020.30 was not recovered. One of the primary mitigating factors in the case was that Ms. Jackson had four minor children. At sentencing, her advisory guideline range was 51 to 67 months. (D.E. 31). She was sentenced to 24 months imprisonment. (D.E. 39).

In *United States v. Hayford*, 20-CR-00088-CVE, Northern District of Oklahoma, Mr. Hayford pled guilty to one count of bank fraud in violation of 18 U.S.C. § 1344 and one count of false statements to a financial institution in violation of 18 U.S.C. § 1014. (D.E. 26).[21] His loss amount was $8 Millions. Mr. Hayford did not enter into a written plea agreement. He was sentenced to 24 months imprisonment. (D.E. 38).

The sentences in the above cases were significantly under the low-end of the applicable Guidelines. Mr. Philus is considerably less culpable than Ms. Jackson and Mr. Hayford; he did not file the applications himself, did not create the fraudulent documents, and he minimally financially benefitted. In all of the above-referenced cases, all the defendants received sentences well below their guidelines, and as such, a well below guideline sentence is appropriate in this case.

---

[21] Undersigned counsel obtained this information from DOJ press releases at https://www.justice.gov/usao-ndok/pr/arkansas-project-manager-sentenced-connection-covid-relief-fraud. Last accessed May 23, 2021.

*United States of America v. Johnny Philus*
Case No. 21-cr-20067-MGC-2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 20 of 21

## IV.    <u>CONCLUSION</u>

Punishment comes in many forms, and it is the unenviable task of this court to determine what form is most appropriate. All too often, courts find that the only truly punitive tool at their disposal is lengthy imprisonment. The Supreme Court in Booker vested district courts with the ability to consider the facts and circumstances, and more importantly, the unique characteristics of each defendant and his involvement in the crime they were convicted of.

This was a stupid, inexcusable, almost profitless crime that has absolutely destroyed Johnny Philus's life and will forever have a severe negative impact on his future. Mr. Philus is a good man who made a grave error in judgment when he committed the crime which he pled guilty to. He has readily admitted his mistakes and accepts responsibility. Johnny now stands before the court as a convicted felon who will forever have to live with the shame and consequences of his acts. Johnny Philus has caused irreparable damage to his family and career. He is disgraced in the community and now faces the weight of being a convicted felon forever.

He has accepted responsibility for his actions and is truly repentant. 18 U.S.C.§3553(a) states that any sentence imposed must be "sufficient but not greater than necessary." In this instance, the Defendant recommends the court to sentence Johnny Philus to a sentence below the applicable guideline range to one year and one day incarceration followed by twelve months of house arrest and three years of supervised release. The Defendant also requests that this court recommend the Defendant serve his sentence at the Federal Prison Camp in Miami.

**WHEREFORE,** based upon the foregoing and additional arguments to be made at the time of sentencing, the Defendant, JOHNNY PHILUS by and through

*United States of America v. Johnny Philus*
Case No. 21–cr–20067–MGC–2
Sentencing Memorandum and Incorporated Motion for Downward Variance Below the Low End
of the Applicable Guideline Range
Page 21 of 21

his undersigned counsel, moves this court to grant his motion for downward variance in accordance with 18 U.S.C. §3553 and sentence the Defendant to a sentence of a period of twelve (12) months and one day incarceration followed by twelve months house arrest and three years of supervised release. The Defendant also requests that this court recommend the Defendant serve his time at the Federal Prison Camp in Miami.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record this 25th day of May 2021.

Respectfully submitted,

JEFFREY S. WEINER, P.A.
ATTORNEYS AT LAW
Two Datran Center, Suite 1910
9130 South Dadeland Blvd.
Miami, Florida 33156–7858
305 670–9919
305 670–9299 Fax
lawfirm@jeffweiner.com

By:    */s/Jeffrey S. Weiner*
JEFFREY S. WEINER, ESQUIRE
Florida Bar No. 185214

By:    */s/Annabelle Nahra Nadler*
ANNABELLE NAHRA NADLER, ESQUIRE
Florida Bar No. 96072

By:    */s/ Diego Weiner*
DIEGO WEINER, ESQUIRE
Florida Bar No. 122454

By:    */s/ Yisel Villar*
YISEL VILLAR, ESQUIRE
Florida Bar No. 1015657